UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LOWDER,<br><br>    Petitioner,<br><br>v.<br><br>RAYMOND MADDEN, Warden,<br><br>    Respondent. | No. 2:15-cv-00912-TLN-AC<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action proceeds on the petition filed on April 6, 2015,[1] ECF No. 1, which challenges petitioner's 2012 conviction for lewd acts with a child under the age of 14 years. Respondent has answered, ECF No. 17, and petitioner did not file a traverse.

## BACKGROUND

I.    <u>Proceedings in the Trial Court</u>

    A.    <u>Preliminary Proceedings and Conviction</u>

Petitioner was charged with four counts of lewd acts against a child under the age of 14. There were two trials in this case. During the first trial, the jury convicted petitioner of two lewd act counts against his niece, and a mistrial was declared as to two counts of lewd acts involving

---

[1] See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is deemed filed on the date the prisoner delivered the document to prison officials for mailing).

1

petitioner's daughter. In the second trial, the jury convicted petitioner of two counts of lewd acts against his daughter and sustained a multiple-victim allegation.

At the start of the first trial, petitioner filed a motion in limine to exclude evidence pertaining to Barbie dolls that petitioner had altered by adding nipples to the breasts and a vagina. CT 130–32.[2] Petitioner argued that evidence of the Barbie dolls should be excluded as inflammatory, irrelevant, and more prejudicial than probative. Id. During the hearing on the motion, the prosecution argued that the evidence was relevant to petitioner's intent. 1 RT 31–32, 37.[3] The trial court granted the motion and found that the prejudicial effect of the evidence outweighed the probative value. CT 39–40.

At the start of the second trial, petitioner again filed a motion in limine to exclude evidence pertaining to the altered Barbie dolls. CT 376–78. Petitioner advanced the same arguments made in his motion in limine from the first trial. Id. The prosecution argued the evidence should be permitted to show petitioner's sexual intent towards his daughter. 2 RT 109.[4] In response, petitioner argued that there is a concern that the jury will be so horrified and disgusted by the modified dolls that they will ignore the other evidence. 2 RT 110. Ultimately, the trial court denied the motion, finding that, although it appreciated the prior judge's ruling, the court was not bound by it and on balance the evidence is substantially more probative on the issue of intent than it is prejudicial. 2 RT 121.

B. The Evidence Presented at Trial

The following statement of the case is taken from the unpublished opinion of the California Court of Appeal on direct review:[5]

> The first jury convicted defendant of two lewd act counts against M., defendant's niece, but deadlocked on two lewd acts counts involving L., defendant's daughter, and a mistrial was declared as

---

[2] "CT" refers to Clerk's Transcript on Appeal, volumes I–III.
[3] "1 RT" refers to Reporter's Transcript on Appeal, volumes I and II, containing the 2010 trial transcript (Lodged Doc. 3).
[4] "2 RT" refers to Reporter's Transcript on Appeal, volumes I and II, containing the 2012 trial transcript (Lodged Doc. 2).
[5] The undersigned has independently reviewed the trial record and confirms the accuracy of the state court's recitation of the evidence presented at both trials.

to those counts. The second jury convicted defendant of two lewd act counts against L., and sustained the multiple-victim allegations.

The evidence at the two trials largely overlapped. We first will describe the evidence from the first trial. We will not repeat substantially similar evidence introduced at the second trial, but instead describe the material differences at that second trial.

*First Trial*

*L.*

L., defendant's daughter, was born in 2001 and was nine at the time of trial. On Christmas Eve or the night of Christmas, when she was seven and after her parents were divorced, defendant visited the family home and spent the night. While her mother and brother were asleep, L. was on the couch with defendant in the living room, watching television. Defendant touched her "private part" with his hand, under a blanket (count I). She told him to stop and moved to a chair. Defendant sat in the chair and touched her private part again, over her clothes (count II). She again told him to stop, and she went to bed. When she was about four or five, she was watching a movie on the couch and defendant accidentally touched her "privates" over her clothes, when he was rubbing her belly. She finally told her mother about the incidents because, "I was just hurting inside, because I don't like keeping secrets."

*L.'s prior statements*

On April 13, 2009, Detective Mims monitored an interview of L. at the "SAFE Center," referring to "Special Assault Forensic Evaluation." A recording of this interview was played for the jury.[6] L. said defendant touched her "inside the wrong place[,]" and first did it by accident while "he was just trying to rub my belly, but the second time he did it on purpose." This second incident had been at Christmas, and she had told him to stop "and then he [kept] on doing it again and again." Contrary to her trial testimony, she said he first touched her in the swivel chair, and then touched her on the couch, but then she said, "Actually, first it was on the couch and then I moved to the swirly chair and then he went to the swirly chair and he [kept] on touching me in the wrong place and I said, 'Stop it,' and he [kept] on doing it and then I just said, 'Good night.'" She again said it started on the chair, but later repeatedly said it started on the couch. He touched her over her pajamas, multiple times because she would try to move his hand away and he would put his hand back on her.

*L.'s mother Anne-Marie*

On March 13, 2009, L. told her mother that defendant "had touched

---

[6] [Footnote 6 in original] Various recordings introduced at the two trials are not in the appellate record. Because the parties quote from written transcripts of the records used at trial, which are in the record, and do not contend they are inaccurate, we, too, quote from those transcripts.

3

her privates" when she was four, before Anne-Marie and defendant had divorced. Anne-Marie asked L. if it could have been an accident, but L. "was very adamant and said, 'No.'" L. cupped her hands over her vagina to show where defendant had touched her, and at one point L. covered her face with her hands. A couple of days later, L. mentioned the Christmas incident. When Anne-Marie asked L. why she had waited to say anything "she cried and said, 'Because I didn't want to get Daddy in trouble, and I didn't want Daddy to go to jail.'" Anne-Marie called defendant around March 14 or 15, 2009, and told him L. had said he touched her privates, and he did not deny the allegation, instead, "[t]here was a long silence on the phone, and then he said, 'Wow. Whoa. Wow.'" When defendant called sometime later to ask when he could see his children and when they could discuss L.'s claims, he did not deny the claims, but "begged me and told me that he would go get help[,]" and said he did not think L. would lie about such a matter. Anne-Marie had noticed that L. had been less "enthusiastic to see" defendant before then.

Later, Anne-Marie initiated a recorded pretext telephone call to defendant. In that call, defendant said he did not remember why he did "anything" and did not know what happened, but "all I can think of is it was in a drunken stupor, and I didn't know what the fuck I was doing." He admitted he did not think L. would lie about this, and then said he was tickling her, "And then I was like, 'Whoa, sorry.' And I was touching her chest, and I didn't mean to. And I was like whoa." When Anne-Marie referred to an incident when defendant videotaped "Kara" "and zoomed in and out of her behind[,]" and then asked defendant about M., defendant said, "That was when I was like 17 or something like that. I told you about that. I told you I had talked about that with M., and I tried to work that out. And I was wrong." He then referenced abuse he had suffered and stated "I just was trying to pass on the shame. . . . And it wasn't right." When asked if he touched L.'s vagina, he could not remember, but then admitted that, "A couple [] years ago, I think I was grabbing her on her inner thigh, and I was like whoa, and I tried -- and I backed off. But I don't know what happened." Defendant promised to obtain counseling.

At trial, Anne-Marie explained that Kara was a 13-year-old former next-door neighbor, and Anne-Marie had found a videotape defendant had shot in which he "was zooming in and out on her bottom." Later, after defendant had the camera, Anne-Marie tried to play the tape back but "I got snow." In 2008, defendant stayed at Anne-Marie's house for several days around Christmas. Although he drank Christmas Day and passed out in the early afternoon, by the time she and her son went to bed at about 9:30 p.m., he was not drunk, and he and L. were still awake.

*Cheyenne*

Cheyenne was born in 1980, and when she was between 12 and 14, defendant had been her mother's boyfriend. When she was about 13, when defendant was telling her a story and brushing her hair "he kind of just kind of kept going down, and then he just kind of

4

rested his hand on my backside for [a while]. I just had a kind of weird feeling, so I just kind of pretended I was asleep, and then he left." He rested his hand on her backside, over her clothing, for "two minutes." Sometimes when he would hug Cheyenne or her sister, "he'd make it so he could put his hands kind of on our chest." She told her mother about the brushing incident the next day and defendant left "probably that night or the next day," but eventually came back.

*Detective Carol Mims*

Detective Mims spoke with M. on the telephone on April 16, 2009, and M. "was emotional[,]" and she spoke with M. in person on May 7, 2009.

Detective Mims interrogated defendant on April 29, 2009, and a videorecording was played for the jury. Defendant said he was "mortified" and "pretty sad" about the fact his daughter said he touched her inappropriately, and he could not figure out what could have happened to cause her to say so, though he admitted to alcohol blackouts. He conceded he had touched L. on the chest while cuddling with her and rubbing her, and that she had given him a "weird" look which caused him to stop. He did not remember touching her vagina, as she had reported. He admitted he had had "other issues" with teenage girls, including Kara, who was about 14: Around 1997 or 1998, he had been videotaping [his daughter walking or her first steps], but his wife "felt like I was zooming in on Kara[,]" on her breasts. He also mentioned that when he was possibly not quite 18 but maybe while in his 20's, there was an incident with M., but "we've worked it out. We talked about it." In this incident, when M. was about eight or nine, they were wrestling, he got aroused, as did she, and she rubbed his penis under his pants until he ejaculated. Both apologized for what happened, and they were "close after that still." Defendant claimed M. started it, and wanted to straddle him and rub her vagina on him. "It was exhilarating, but it wasn't -- I don't know. There was a lot of shame afterwards." When Detective Mims explained that M. had described defendant putting his finger in her vagina, defendant said he had never done that. Defendant had a girlfriend (Lisa) who had two daughters, and once defendant was brushing the hair of the older daughter, who was 12 or 13, when she became upset, apparently because defendant told her she was beautiful. When told that Cheyenne had reported he had "touched her butt on the outside of her clothing[,]" defendant replied, "Um. I don't think it was intentional." He conceded Lisa was distraught about the incident and he had to leave. When Detective Mims stated that defendant had a history, "in that you get aroused by younger girls." Defendant replied: "To a point, yeah." But he denied being aroused by his own daughter, continued to deny remembering doing anything to her, but agreed he needed therapy and asked if the detective had "any references as far as counselors or therapists that would be good for me?" When Detective Mims later repeated that defendant was aroused by younger girls, defendant said, "I've tried to deal with that over the years." He was "nodding in agreement" when she said he was aroused by young girls.

5

*M.*

M., born in 1983, was defendant's niece. When she was about four or five, she was visiting defendant, in the bed with him, when he touched her vagina under her clothing, but did not penetrate her vagina. She did not report this, "Because I didn't want him to get in trouble." When she was about seven or eight, at the American River, defendant tried to get her to go into the bushes with him, and rubbed her back and "behind area" over her clothing, but defendant got scared when M.'s brother rode by on a bicycle. M. did not report this incident because she thought it was not important. When M. was about 13, at defendant's apartment, lying on his bed, he came in and put his hand on her vagina, under her clothes, for about four or five minutes, and moved his hand around, but did not penetrate her vagina (count III). M. didn't say anything because she was scared. Then he took her hand and made her feel his "hard" penis on the outside of his clothing, and moved her hand around, just "for a couple seconds," until M.'s brother came in the room (count IV). When she was 13 or 14, at the apartment defendant shared with Anne-Marie, when she was standing in the computer room defendant "placed his hand on my butt" and moved it around, stating, "I wish that I could be with you." When asked why she continued to be in defendant's presence after he molested her, M. testified she loved him, he was her uncle, and he had been her only consistent male role model. However, she also testified she was scared to report him and hated him at the same time she loved him. After the last incident, when she was 15, M.'s mother sent her to live with defendant and Anne-Marie in Oregon for several months, and she did not tell her mother about what had happened because she did not want defendant to get into trouble, but did tell her mother she did not want to live there. She had no memory of an alleged incident (as described by defendant in his statement to Detective Mims) when she was about eight in which she was wrestling with defendant and she rubbed his penis.

*Defendant*

Defendant claimed that at the time of his police interrogation, he was depressed, possibly suicidal, and had been drinking heavily and using methamphetamine. He claimed he was rubbing L.'s stomach while they watched TV, she looked at him and he realized his had "had lingered at her chest," so he apologized. He never intentionally touched her vaginal area. He had no sexual interest in his daughter, or in other young girls. He never intentionally touched Cheyenne's buttocks. He denied any incident with M. when she was three or four, and denied a sexual interest in her. The incident he described to Detective Mims in which he ejaculated as he wrestled with M. happened when she was about five or six (not eight, as he had said before) and was "quite disgusting." He admitted it was "exhilarating" at the time, as he had told Detective Mims, and claimed that was the issue on which he requested a referral to a counselor. He denied the incident M. described at the American River. He claimed he denied touching L. inappropriately when Anne-Marie first called him to ask about it. He claimed Kara, aged 13, had been infatuated with him, which he found flattering.

6

He denied zooming in and out on Kara's breasts when he videotaped Kara.

The first jury convicted defendant of the two counts involving M., but deadlocked on the counts involving L., and the trial court declared a mistrial on those counts.

### Second Trial

The principal differences at the second trial were that the second trial judge admitted additional uncharged act evidence regarding Destiny and evidence that defendant made sexual modifications to Barbie dolls that the first trial judge had excluded, M. did not testify (but the parties stipulated that defendant had been convicted of molesting her), and an expert testified about Child Sexual Abuse Accommodation Syndrome (CSAAS).

*Anne-Marie*

Anne-Marie testified at the second trial consistent with her earlier testimony. She also testified that she had purchased Barbie dolls for L.'s birthday, they went missing, and Anne-Marie found them in February or March of 2007, in a work shed, with added nipples, "Areolas that looked very realistic[,]" and vaginas and labia. Barbie dolls do not come with such features.[7]

In the second trial, a longer version of the pretext call Anne-Marie made to defendant was played for the jury. In the newly admitted portions on the call, Anne-Marie referenced "the dolls that [defendant] mutilated and created vaginas out of them, and then Destiny." Defendant said, "the dolls had nothing to do with anything" and that Destiny "was trying to hump my foot." He claimed he did not know they were his daughter's dolls, and claimed he found them in the shed, or in the back room. He claimed the dolls were not "about the kids" and he "was tweaking out of my fucking mind and bored."

To "give context" to that portion of the pretext call, Anne-Marie testified that Destiny was an eight-year-old neighbor who had told Anne-Marie about inappropriate touching by defendant, and M. had also told Anne-Marie about inappropriate touching by defendant. Anne-Marie also testified L. told her she waited to reveal the abuse because she did not want defendant "getting mad at me and I didn't want daddy to get in trouble and go to jail."

*L.'s grandmother*

L.'s grandmother testified L. told her defendant had touched her privates over her clothes, she had "told him no" and moved to the swivel chair, but defendant followed her there, touched her again,

---

[7] [Footnote 7 in original] Contrary to some indications in the appellate record, the parties assume that the actual dolls were not admitted into evidence, and that only color pictures of them were introduced at trial. We need not resolve the point, because it makes do difference to our analysis.

7

and she again said to stop, and left the room.

*L.*

L. testified that during the Christmas incident, defendant touched her first on the couch and then on the chair, and long before there was an incident when he accidentally touched her privates when he was rubbing her belly.

*Detective Mims*

Detective Mims's testimony was largely consistent with the first trial. More parts of her recorded interrogation of defendant were played for the jury than at the first trial. In particular, defendant discussed Destiny, about age eight, "humping" his foot more than once. He denied the dolls had anything to do with children, claiming he had been trying to get Anne-Marie interested in a hobby. He thought he "did a great job. And I wish I could get the damn Barbie just so I could see if I could sell it on EBay." He made "nipples on her and made a vagina out of like this rubber stuff" "basically just seeing if I could do it."

*Cheyenne*

Cheyenne's testimony at the second trial was largely consistent with the first trial.

*Dr. Anthony Urquiza*

Dr. Urquiza was a psychologist who ran a child abuse treatment program at UC Davis Medical Center, and a professor in the pediatrics department. He has testified as an expert in CSAAS "probably a little over" 200 times, mostly for the prosecution. CSAAS was a teaching tool for therapists treating sexually abused children, *not* a diagnostic tool to determine if abuse has occurred. He knew nothing about the facts of this case.

CSAAS has five components: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) retraction (not an issue in this case, as L. did not retract her testimony). Secrecy refers to the fact that in most child sexual abuse cases the child knows the abuser, who is usually bigger or stronger and often in a position of authority over or danger towards the child or loved ones, or a source of special attention, and therefore the child will not disclose the abuse; it is a common myth that most abuse occurs at the hands of strangers. Typically abusers "groom" their victims by starting in small ways and progressing to more serious abuse. Helplessness refers to the fact that it can be psychologically difficult for a child to report an abuser. Entrapment and accommodation refers to how children deal with the feelings of helplessness because of the secret abuse, such as by wearing extra clothing or pretending to be asleep during the abuse, or by dissociation, where they shut down their feelings to cope with the experience. Delayed and unconvincing disclosure refers to the fact that it is common for children to delay disclosing

8

for months and years, by which time their memory of the details may have degraded. Generally, the closer the relationship between the abuser and the child, the longer it will be before the child discloses.

*Defendant*

Defendant testified he bought Anne-Marie craft supplies because she was interested in a Barbie doll Website, but admitted he had added the nipples and genitalia to the dolls, while he was using methamphetamine, to try to sell "risqué" dolls on the Internet because "sex sells." When asked if he was proud of his work, he testified he thought he "did a decent job on the nipples." He hid the dolls so his children would not find them, not because they were inappropriate. Anne-Marie found the dolls early in 2007, became angry, and they separated a month later.

Kara was helping him film L.'s first steps walking towards him, he put the camera on a couch, and Kara walked in front of the camera "and bent over, and I guess it looked down at her cleavage."

Destiny "would run up and grab" defendant, and it made him "uncomfortable" when she sat on his foot and "was rubbing her crotch on my foot."

He brushed Cheyenne's hair, after he had been up for days using methamphetamine, and she avoided him thereafter, but he did not think he had touched her inappropriately.

He was rubbing L.'s stomach on the couch at Christmas and accidentally touched her chest, and moved his hand when she looked at him. He never touched her vaginal area. In the incident when L. was four or five "I accidentally was reaching for the far side of her legs and I went between her legs for a second like that. 'Whoop[], sorry.' It was like that."

Defendant ejaculated when M., aged eight, was rubbing on him. He denied touching M.'s vagina, but conceded he had been convicted of it.

*Stipulations*

The parties stipulated "that the defendant was convicted of putting his hand on his niece M.[]'s vagina and having her put her hand on his penis between September 20, 1995 and September 19, 1997."

The parties also stipulated defendant was not under the influence of alcohol or methamphetamine during the Christmas Day incident.

ECF No. 17-1 at 3–12.

////

////

9

C. Outcome

As noted above, the second jury convicted defendant of two lewd act counts against L., and sustained the multiple-victim allegations.

During sentencing, the trial court judge stated that "the insight of [petitioner] modifying the Barbie dolls was emblematic of" his "unhealthy and unnatural disposition towards young girls." 2 RT at 696. The court further addressed petitioner, noting,

> That gave a real picture into how you think and what occupies your thoughts and your soul. You sexualize a child's toy. You see children as sexual objects. And that is very, very disturbed, and it warrants the maximum that I can give you in State Prison, and that's what I intend to do.

Id. Ultimately, petitioner was sentenced to an aggregate term of eight years followed by an indeterminate term of thirty years to life for his convictions. Id. at 697.

II. Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on October 30, 2013. ECF No. 17-1. The California Supreme Court denied review on January 15, 2014. Lodged Doc. 8.

Petitioner does not appear to have filed a petition for writ of habeas corpus in state court.

By operation of the prison mailbox rule, the instant federal petition was filed April 6, 2015.[8] ECF No. 1. Respondent answered on March 21, 2016. ECF No. 17. Petitioner did not file a traverse.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[8] See supra n.1.

10

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. at 99 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407–08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520–21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399. Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to

"the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 101.

## DISCUSSION

I. The Claim: Whether the Barbie Doll Evidence Admitted at the Second Trial Violated Due Process[9]

Petitioner contends that the trial court improperly admitted evidence of altered Barbie dolls in violation of his due process rights.  ECF No. 1 at 4.  The prejudice of the evidence was greater than its probative value.  Id.

II. The Clearly Established Federal Law

The admission of evidence is generally a matter of state law, and habeas relief does not lie for errors of state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Moreover, "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Id.  To the contrary, the Supreme Court has rejected the argument that due process necessarily requires the exclusion of prejudicial evidence.  Spencer v. Texas, 385 U.S. 554, 563–64 (1967); see also Dowling v. United States, 493 U.S. 342, 352 (1990) (noting that "the category of infractions that violate 'fundamental fairness'" is defined "very narrowly").  The Supreme Court has rejected the theory that admission of prior bad act evidence violates due process where it is relevant to an issue in the case.  Estelle, 502 U.S. at 68–70.

////

---

[9] Petitioner voluntarily dismissed his unexhausted second claim for ineffective assistance of counsel.  ECF No. 7.

III. The State Court's Ruling

Because the California Supreme Court denied petitioner's claim without comment or citation, Lodged Doc. 8, this court "looks through" the silent denial to the last reasoned state court decision. See Ylst v. Nunnemaker, 501 U.S. 797 (1991). The California Court of Appeal denied petitioner's evidence claim in a reasoned order, so that is the decision reviewed for reasonableness under § 2254(d). See Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005). The court of appeal ruled as follows:

*Barbie Doll Evidence*

> The first trial judge excluded the Barbie Doll evidence. The second trial judge admitted this evidence. In separate claims, defendant contends the second trial judge should not have reconsidered the earlier ruling, and contends that the evidence was unduly prejudicial.
>
> . . .
>
> *B. Undue Prejudice*
>
> Defendant contends the Barbie doll evidence was unduly inflammatory and prejudicial and therefore should have been excluded. We disagree.
>
> First, we reject defendant's view that the evidence was irrelevant, or minimally relevant. The People had to prove defendant touched the victim with lewd intent. (§ 288, subd. (a).) Defendant's not guilty plea placed his intent at issue, and the Barbie dolls rationally tended to prove that disputed fact of intent. (See *People v. Rowland* (1992) 4 Cal.4th 238, 260; Evid. Code, §§ 210 [relevant evidence has "any tendency in reason to prove or disprove any disputed fact that is of consequence:], 1101, subd. (b) [evidence of prior acts not inadmissible if used to prove, inter alia, "intent"].)
>
> Although the inference is not *compelled*, and defendant testified to an alternate inference, a rational jury could infer that the addition of genitalia to the dolls reflected a sexual interest in young girls. Indeed, defendant himself admitted the modifications were sexual, although he denied that the dolls reflected *his* sexual interests. Further, although again the inference is not compelled, the jury could rationally credit the disputed testimony and find that these dolls had belonged to L., and therefore that these modifications reflected the defendant's sexual interest in her in particular. Either or both of these rational inferences would bolster the People's theory that when defendant touched L. as she testified, he did so with lewd intent. (See *People v. Memro* (1995) 11 Cal.4th 786, 864-865 (*Memro*) [sexually explicit photographs and stories about young males, including children, admitted to show lewd intent towards boys]; *People v. Bales* (1961) 189 Cal.App.2d 694, 701

13

[nude photograph of victim tended to show lewd intent].) It was for the jury to determine whether the dolls illuminated defendant's lewd intent.

Defendant's objection that a Barbie doll depicts an adult character, not a child character, goes to the weight of the evidence. Such dolls are designed for use by children and their physical unrealism is manifested in part by a *lack* of genitalia. The jury could rationally infer that by modifying those dolls in what defendant conceded was a sexual way, they reflected his intent to sexualize children. And the fact Anne-Marie testified she found the dolls *before* the charged offenses does not make them irrelevant, because the jury could rationally conclude that defendant's sexual interest in young girls was longstanding.

Second, we reject defendant's view that the dolls were too inflammatory.

Evidence code section 352 (§ 352) provides in full: The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*Harris*, *supra*, 60 Cal.App.4th at p. 736.) "'Prejudice' does not mean a result which is unfavorable, it means a result which is unfair." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1109; see *People v. Yu* (1983) 143 Cal.App.3d 358, 377.) "'The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

As we recently pointed out: "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167 (*Holford*).) Moreover, "Trial courts enjoy '"broad discretion"' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Holford*, *supra*, 203 Cal.App.4th at pp. 167-168.)

In the second trial, the parties stipulated that defendant had been convicted of putting his hand on M.'s vagina and having her put her

14

> hand on his penis. Further, the jury heard L.'s testimony and prior statements about the charged acts. The record on appeal includes color photographs of the dolls. The modified dolls were not so distasteful or upsetting that they would cause jurors to become inflamed against defendant so that they would *unfairly* assess all of the trial evidence.[10] Further, the dolls did not "prey on the emotions of the jury" (*McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1385) as defendant claims. (AOB 26-27) Far more disturbing evidence admitted to prove sexual intent has been held to fall within the trial court's broad discretion. (See *Memro*, *supra*, 11 Cal.4th at pp. 864-865 [photos of "young boys in sexually graphic poses"]; *People v. Clark* (1992) 3 Cal.4th 41, 129 [depiction of "a decapitated head orally copulating a severed penis"].)
>
> Thus, the trial court did not abuse its discretion by finding the probative value of the Barbie dolls was not "'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice[.]" (*Holford*, *supra*, 203 Cal.App.4th at p. 167.)
>
> Finally, to the extent defendant contends the evidence violated federal due process principles, we disagree. "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v. Kelly* (2007) 42 Cal.4th 763, 787; cf. *People v. Partida* (2005) 37 Cal.4th 428, 439 [even if evidence should be excluded under state law, its admission "results in a due process violation only if it makes the trial *fundamentally unfair*"].) As explained, there were two inferences the jury permissible [*sic*] could draw--but were not compelled to draw--from the Barbie doll evidence, *viz.*, that defendant had a lewd intent toward young girls generally, and that he had a lewd intent toward his daughter in particular.

ECF No. 17-1 at 13–19.

IV. <u>Objective Reasonableness Under § 2254(d)</u>

The California Court of Appeal's denial of this claim cannot have involved an unreasonable application of clearly established federal law, because the United States Supreme Court has never held that due process is violated by the admission of evidence that is more prejudicial than probative. See Holley, 568 F.3d at 1101 (AEDPA bars relief on claim that admission of prejudicial evidence violated due process). Because no Supreme Court authority squarely addresses the issue, there is no clearly established federal law within the meaning of

---

[10] [Footnote 10 in original] As we said in a similar context, "Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737 (*Harris*).)

AEDPA and relief is barred.  Wright v. Van Patten, 552 U.S.120, 125 (2008); Holley, 568 F.3d at 1101.

Even under pre-AEDPA standards and Ninth Circuit precedent, "only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process."  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  Here, petitioner did not and cannot show that no permissible inferences existed that the jury might draw from the Barbie Doll evidence.  Indeed, as the Court of Appeal correctly noted, there were clearly at least two permissible inferences that the jury could draw: (1) that defendant had a lewd intent toward young girls generally, and (2) that he had a lewd intent toward his daughter in particular.  ECF No. 17-1 at 19.  In other words, the evidence was relevant to petitioner's intent because it aided the jury in assessing the charges against petitioner; and the jury could draw the inference that because of his modifications to the Barbie Dolls, a child's toy, petitioner acted with a lewd, sexual intent when he touched his daughter.  Because these inferences were permissible, admission of the evidence did not meet the standard of being so extremely unfair that it violated fundamental conceptions of justice.

For these reasons, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to AEDPA standards, petitioner has not established any violation of his constitutional rights.  Accordingly, petitioner is not entitled to relief.

## CONCLUSION

For all the reasons explained above, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.  It is FURTHER RECOMMENDED that a certificate of appealability, see 28 U.S.C. § 2253(c), be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 29, 2019

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE